Defendant Kathleen. Arguing on behalf of the plaintiff's account, Mr. Peter Romero. Arguing on behalf of the defendant, Kathleen, Mr. Sean M. Sullivan. Thank you, gentlemen, for waiting. We had some scheduling to take care of, so I apologize that we're a little late. But you'll get your lunch before we do. All right, Mr. Gromieder, if you're ready, you may proceed. I may please the Court. The decision of the trial court in this matter just defies explanation. It defies the law of the state of Illinois. It defies the laws of gravity. It defies the laws of physics. And it defies the record. And it defies common sense. We're asking you today to reverse this decision and revamp the matter for a hearing on the damages. Now, I'm not unmindful of the burden that's placed on an appellant who comes in and tries to reverse the decision of a trial court which is couched in facts. The appellant must show that the finding is against the manifest way to be evidence. And quite frankly, the classic definition of a manifest way to be evidence is when the opposite conclusion is apparent, when the findings appear to be unreasonable or arbitrary or not based on the evidence. So I had to take 34, 35 pages of my brief to set forth the facts in this case. And that's a lot. And I know it's a lot. But it was necessary, I felt, to show the entire picture of the facts that were presented and the history of what transpired on these two particular pieces of property. Now, we have some undisputed facts. We know that there was a train wreck in January of 1993. We know that there were seven locomotives involved. We know that the train wreck happened on the property and right-of-way of the Burlington Northern and Salem and Fay. And they have admitted responsibility for that wreck. We know that there was 5,800 to 6,800 gallons of fuel spilled onto the Burlington Northern and Santa Fe right-of-way. What kind of fuel? Diesel fuel. Any numbers? Number two. Number two. Now, we know there was staining that was observed and reported. We know that the staining was on the south side of the right-of-way. We know that our property is to the south of the spill. We know that our property is only 60 to 70 feet from the site of the spill. We know the spill occurred here. Our property is down here. We know that it's downhill, what they call downgraded, from the site of the spill to our property. Of that 6,000 gallons of spilled fuel, only about 600 gallons were ever recovered. We know that water and fuel oil, diesel fuel, flow from a higher level to a lower level. We know that in response to this, that the Burlington Northern hired consultants who went out and dug monitoring wells. We know that within those monitoring wells, there was found to be free-floating product, that is, petroleum product floating on water. We know that in well number 14, which is immediately adjacent to the Indian Creek property, and I mean immediately adjacent, they found at various times up to 33 inches of floating petroleum. We know that in soil boring number 9, which is a small boring that they go down, which is right next to the property line and right next to well 14, that there was found to be number 2 fuel oil reported. So, we have these undisputed facts. Now, in response to this spill... Could it have come from somewhere else? I'm sorry? Could this have come from anywhere else other than... There's no evidence of any other spills that took place. There is nothing substantive. The trial court did, in its order, deal with what it called some alternative sources or potential sources, but some that evidence to be not probative. Was there any evidence put on by the railroad that there may have been alternative sources for this? I'm sorry, I'm having trouble hearing today. Oh, I'm so sorry. Was there any other evidence put in by the railroad to indicate that there may have been other sources that could potentially have been the cause of this? No? Okay. So, what we have is that they went and got these consultants and their own project manager testified at trial. They only hired well qualified consultants. So, starting immediately after the spill in 1993, March of 1993, you have the reports of Peridium, the first consultant on the job. They reported the iridescent sheen on the ground to the south towards our property. They found that there were total petroleum hydrocarbons, and that is present in the monitoring wells on the south. Up to 1.38 feet of free product in those monitoring wells. They recommended, quite frankly, that in their report, they recommended that the contaminated soil to the south be removed. But that was never done. In January 1995, the Burlington Northern replaced Radion as their consultant with RETAC. RETAC came out and dug 10 additional monitoring wells, all on the south and all towards the Indian Creek property. They found free product in those monitoring wells. And they filed reports. In October of 1995, their report stated, Wells on the southern property boundary contained up to 7 inches of phased separate product. And further went on to say, An expanded monitoring of the well network indicates that groundwater and floating diesel fuel is moving south of the spill area and possibly off of the Burlington Northern Santa Fe property. Also during this period, Paragon Analytics came in. Another consultant, an investigator hired by the Burlington Northern. They analyzed soil along the fence line. The fence line between our property and the Burlington Northern right-of-way. And it showed that there was diesel fuel present in that soil. It goes on. Later, in 2000, we were doing some excavation within our building in order to install some machinery and discovered, when we dug down to put in the footings, that, in fact, there was a free-floating flat-earth river, something down there. And we reported it. Could that material, under this evidence, have gotten that far into the property and that far down under any testimony that was presented? Yes, under some of the testimony that was presented. They had hydrologists come in and testify as to the rates of hydraulic conductivity. Mr. Banasek testified that he calculated it and that the Burlington Northern original consultants all testified that it was 6.02 times 10 to the third power, which I'm sure, if you do the math, you would find came out to about 530 feet a year. Now, Mr. Weaver... All right, that's on the ground. It goes this way. How does it get down? How fast is it going down? How fast is it going down? Under this hydraulic conductivity procedure. I think it would go down and sideways at the same time. I don't want it to go into the ground. I'm talking about where your footings were. How deep were those footings that you were digging? The footings that we were... I don't remember that in the record. I think the footings for the machines could be... I would be speculating. We may be able to find it for you. I'm sure other consultants may be able to answer that question for you. But they were substantial. Yeah, they were substantial. We're talking about a big machine. The cement floor, because you're bringing in big machinery, right? That's correct. Whether they were 4 foot or 8 foot or 6 foot or... I don't remember. Okay. I'm sorry. But we do know that we found that material. So then we notified Burlington Northern and the EPA. And the Burlington Northern came in, and they hired Environmental Management Resources, EMR. They came out, and they reported that they smelled a strong odor resembling diesel fuel coming from that excavation site. That wasn't done as a testing. Was that done because there was something needed to be done on the property, like some sewage fixed or something to that effect? Was there a time when something was kind of inadvertently discovered? Or was I reading that wrong? The excavation was part of it. There had been other soil moorings done prior to that time. But the big concern was what had moved underneath the building. And so they had some of the soil. Burlington Northern authorized EMR to remove soil and have it tested. From the excavation site? From the excavation site. And the report that came back was that it contained diesel range organic concentrations. Aren't there a number of diesel fuels that qualify under that range, though? There are. You go from C6 all the way up to C50 carbon concentrations. Diesel is what is often referred to as a middle distillate. But it is within that range. Heavy fuel oil has the higher concentrations of carbon. And we put that out. But diesel fuel is a middle distillate. And one of the other experts or labs that came out and tested Friedman and Brewer in 2002, they tested property samples from Indian Creek's property. They found that there was a release of more and more of the middle distillates. And as I said, diesel fuel is a middle distillate. But that's one of the points, though, isn't it, that it was more than one? There were more than one. Subsequent experts would opine that that meant it could not have been from a single spill. Well, no, I don't think you can make that assumption because there were more than one fuel tank that cracked and spilled. And each of those fuel tanks probably got filled up with a different batch of oil from a different refinery. Isn't that a probably? I mean, we don't know. Well, we have some testimony to that effect. Right, but of the seven locomotives, we don't know what was in them. The presumption, I think, or an assumption that some of the experts made was that it was all the same fuel. Some of the people, one of the experts, Euler, would have made that assumption. But the point I was trying to get at was each of these tanks would have been filled multiple times from different refineries and would give the same effect as multiple different spills. Okay. Did I clear it up? Sure. I mean, I see your point because I think you're taking umbrage with the assumption that all seven of the locomotives involved in the collision in January of 1993 did not have Or you're taking umbrage with the assumption that they did have the same fuel, correct? That they did have the same fuel? Right. You're saying they did not, and it's more likely than not that they did not have the same fuel. But wasn't there also another layer of it, and again, as time is ticking off, that these samples were analyzed with attempts to date them, and those datings would indicate that all of these fuel samples could not have arisen at the same time. The spills, in other words, would not have arisen at the same time. No, I think that the only testimony, which was the testimony from Torkinson, I believe, who was an expert by Berlington Northern, it dated them to 17 years, plus or minus two years. And there's one other expert that I'm forgetting the name of, but also confirmed that. Actually, it was Schmidt. He reviewed the testimony, the analysis that was done, and he confirmed it to be, or testified to it as being approximately 17 or 18 years, plus or minus two years. So that would have put it right in the date range of when this bill occurred. I don't know how much more time I can take. I did want to address Uhler and the— You can move on to that particular one, and then we'll— Okay. This whole case, really, from Burlington Northern's point, and from Judge Murphy's judgment order, it comes down to what are you going to do with Uhler? And I want to emphasize again, he was the forensic expert that was hired by the Burlington Northern and what he testified to, because the whole case is really—that's the crux of it. This is the forensic chemistry section. Right. And all he testified to was, I analyzed the samples that were given to me. He never looked at the hydrology. He never looked at the bottom of the spill. He didn't look at anything else. He looked at the forensic chemistry, and he said that the diesel was not the predominant petroleum signature. Now, that's not exactly the issue that we have and that Judge Murphy has addressed in his order, because we know from the testimony of both Uhler and from Schmidt that a process called weathering, which is a degradation, can break down petroleum products over time. And the lighter end carbons, such as those in diesel fuel, are more prone to disappear over time. But, in fact, when they weather or break down, do they weather to what looks more like heavy oil, which is what he found, correct? That is correct. But— But they can create heavy oil. Okay. But when they weather and they disappear from the signature, then they won't be predominant in the signature. The predominant would be whatever else is left, which was—he testified was heavy oil. Now, Schmidt, the other forensic expert, did testify that it was diesel, and it did come off of the Burlington-Northern spill and took into consideration the hydraulics and all the other information. But I guess the question remains, if it had weathered—I don't think he said it could weather out. It could weather. It could weather. But even if it weathered, where did the heavy oil come from? I— Which he found much more significant in his analysis, correct? He found that it was heavy oil. That's right. Yes. So where did that come from? Well— Heaven? Yeah. You know that he found it both on the Burlington-Northern Santa Fe property on 1214, and he found it in—well, 25 and 29, which was inside the building. He found the same carbon signature in both those places. But it seems to me that the common sense and the laws of physics and the laws of nature say that if it was— from our site to their site, it had to be going downhill. What about the history of the use of the land? Well— I know you had a motion in Lemonade that was denied. There was a motion in Lemonade, and I thought the judge got it right when he talked after the motion in Lemonade. He says, this isn't enough, and that should—you know, just having a history of heavy industrial use isn't enough. You've got to show me something specific, you know, a specific spill or a specific use. And they were never able to do that. And he came—there was testimony as to the Sanborn Baths, and there was testimony as to these— there was a paint house, but all of them took place to the south of where the spills were located or where our test wells were, and downgrading. Or, as they clearly said, you know, a paint house, that's not a petroleum product. It wouldn't have anything to do with this. So I think that that information, which he relied on, I mean, that's one of the things he really relied on to say that I'm not going to follow Schmidt's opinion, was these alternative fuel sources. He used that to undercut them. The other thing that he tried to do was he tried to say that these speculative alternative contaminations could connect the—but he couldn't connect these to any particular spill on the property. And we have the testimony of the owner and the current owners and the former owner that there had been no other spills on the property since they had it. It wasn't their testimony that they were unaware of anything prior to their— I mean, excuse me, prior to their purchase of the property. They were unaware of anything prior to their purchase of the property, and they purchased the property, I believe, back in the 80s, and there hadn't been any spills since then. And if you're going to buy into Uhler's testimony on weathering, anything that had happened prior to when we got the property certainly is going to be weathered as much as anything— Any diesel. Yeah. The heavier carbons, not so much. Not so much. Didn't the trial court look at some of the equipment that Uhler used? Just like we look at DNA back in 1980 and then we look at DNA in 1990 or 2000, 2015, the technology has changed. Didn't he credit Uhler's use of newer technology as one of the reasons he looked seriously at Uhler's recommendations or analysis? He did. He did mention the fact that Uhler had worked for the Exxon Valdez case and the Deepwater Horizon case, but you still got to look at what Uhler said and what he really just testified to. And he never testified, and they never asked him and he never testified, other than to say that diesel was not the predominant petroleum product in the samples that he looked at. And his samples were taken many years after the spill, and they were the same in well 14 as they were, which is here, as they were inside the building. When were Schmitt's taken? I believe that Schmitt took his at the time that he rendered his opinion, and he also considered Friedman and Bohr's 2002 analysis, and he also considered Tolkienson's analysis of them, and Tolkienson would have been before the 2002 one. And he found that that was speculative and unpersuasive, right? I'm sorry? He found that was speculative and unpersuasive in the trial court found of Schmitt's testimony. Yes. So, without moving into damages, I'm going to tell you that we think that the logic and the record just does not support this case, that it's against the manifest way of the evidence. As to damages, the court flipped on us and tried to tell us that we had the responsibility of apportioning the amount of contamination that the Burlington Northern had done. That's not the way it's done. We pointed that out to our brief, and we cited some law to you in that reply brief. That I found to be really kind of persuasive, and that was that California v. Campbell case out of the Ninth Circuit, and they took a very similar factual situation as we have here, and they had an expert witness who tried to point out that the contamination came from someplace, and the court says, you've got to analyze an expert's witness in light of all of the evidence, and they reversed it on our manifest way cases, and I really like the language of Newton Ray Beatrice that we used, where they, the first district here in Illinois, reversed the case on a manifest way standard, and said, and our sources for doing that are simply the record and common sense, and that's what we're asking for you to do here today. Thank you. Thank you. You'll have an opportunity for rebuttal. Thank you. All right. Mr. Sullivan? Good morning. May it please the Court. It's truly impossible in the span of a 15-minute argument, or even in the span of a 50-page brief, to examine all the evidence and testimony that Judge Murphy saw and heard during this 12-day trial. As the Court's questions and counsel's arguments have acknowledged, the judgment for BNSF was premised first and foremost on Judge Murphy's conclusion that the evidence was insufficient to sustain Indian Creek's burden of showing that the contamination that they complained of on their property came from this 1993 development. He was really, the trial court was really concerned that, or placed a lot of weight on the fact that neither witness, neither expert witness could deal with or explain a pathway to the site. Correct. And I can't remember the names of those witnesses, but that was significant. Why is that so significant? Well, I think it's significant because Judge Murphy sort of segmented his analysis of the evidence and why it supported his conclusions. Certainly, as Your Honor's questions have recognized, the forensic chemistry testimony between Dr. Euler and Mr. Schmidt was a very important component because the first question to answer is, what is it that's on Indian Creek's property? And is that something that could have come from this derailment? So that's one component. Another component of it is, let's put that aside. Is there a way or is there evidence showing a way that whatever was released in this derailment could have migrated from the spot of the release to the places on Indian Creek's property where all this petroleum contamination is found? And so it was more than just, is there a pathway from somewhere on the right-of-way to somewhere on Indian Creek's property? Because the evidence was more extensive than that. Well, counsel would have us really look at the total topographical area, use common sense and say water and oil flow downward. And it was directly adjacent. It certainly was directly adjacent. And it's 60, 70 feet? I think that might be a little bit of a shortening of what the testimony was. But it's directly adjacent, and it's from the middle of about a five-track right-of-way, and then there's the boundary to the Indian Creek property. But what the testimony was, and this goes to Justice Hutchinson's question about the pathway. So both sides had geologists, hydrogeologists' expert testimony. And for Indian Creek, that was primarily Dr. Banaszak, and for BNSF, it was Mr. Weaver. And they each gave testimony concerning the same elements. They described the way that you do an environmental, a hydrogeologic investigation, the things you look at. They each did cross-sections showing what the subsurface conditions were. And they each gave testimony about their opinions about what could have happened with the diesel fuel that was released in the middle of the right-of-way. And Mr. Weaver's testimony was that he did not see a pathway from the ñ in any of the cross-sections that he had done or that anybody else had done. They all sort of had the availability of looking at each other's cross-sections. And so he described in detail subsurface conditions, the clay layers. He talked about the cracks, the sand layers that are typical in subsurface conditions. And his testimony was that those generally do not allow, do not provide for great migration because his testimony was, in his experience, he sees cracks. A heavy contaminant, like a fuel oil, will get into those cracks and not go very far. And because of the cracks and the sand layers, they're not directly interconnected. So that was his testimony about why he doesn't see a direct pathway. Where did the ñ with reference to the distance between the spill and the property line, does that clay layer come in? Is it all the way or ñ It's throughout. It's throughout. There's a series of types of strata in any location, and this being a railway right-of-way. There's a ballast strata, and then there's a fill strata. And I may be butchering this a little bit, but you get down to a clay layer. And both experts, Dr. Banaszak and Mr. Weaver, testified about the relatively impermeable nature of the clay layers. And so they went through the cross-sections, analyzing the degree to which that subsurface topography would affect migration of something once it got down to that clay layer. They both talked as well about the footing, the wall footing, being a barrier to further migration. And so that ñ You mean the existing footings for the building that was later excavated? Well, what I'm talking about is the footing for the wall. In 2000, the excavation that was done inside the warehouse was to dig a pit to put in footings for a piece of equipment. And that ñ the nature of why that excavation was done wasn't really pertinent at trial. What was pertinent, and what both experts gave their opinions about, was the concrete footing that underlies the wall and extends about four feet down below the surface. And there was conflicting testimony about the degree to which that would affect migration of any free product, free petroleum product that reached that far. And so I think it's important to keep in mind, and though the Court recognizes the standard we're operating under here, it's very important to understand that Judge Murphy heard all this evidence. And he heard all the counter evidence. And he found he was not persuaded that that evidence made it more probably true than not true that the contamination on Indian Creek's property came from this derailment. We have this wall, and we have then the pit, the pit being farther south, I guess it would be, of the wall. Do we have any samples along the north end of that wall? Over time, yes. That shows migration had gotten that far. What it doesn't show is what's the nature of the product that was found there. And that's why I wanted to address a little bit some of the sort of stream of facts that are contained in Indian Creek's belief. Legitimately, what they've done here on appeal is put forth the best facts they can marshal, the best evidence they can marshal from the trial that would suggest that it could or would be true that the contamination on Indian Creek's property came from this derailment. And that's really where, you know, where the standard review comes in, because Judge Murphy heard all that, and he heard all the contrary evidence, such as the forensic chemistry evidence, because that's a key point. And we don't run from the fact that that is, you know, that's an element of the evidence that Judge Murphy, I think, would have found no way past in ruling on the plaintiff's claims, because their claim was that the contamination on their property came from this derailment. Did you show that it came from somewhere other than the derailment? Because the testing was within the period that would have been consistent with that derailment. So is that a burden upon you? The burden is not upon us to do that. There are two elements to your question. Number one is that there is conflicting testing about this age dating. And Dr. Euler, who Judge Murphy found more credible, more persuasive, more qualified, said that is a – this age dating process is not reliable, it's not well accepted, it's heavily criticized in the literature. He criticized that he would never rely on it. There was testimony from Mr. Schmidt, who applied it, that on its own undercut the reliability of that age dating, in part because he – there are two different curves you can use based on whether the sample is deep or shallow. The shallow curve he created by doing an experiment in his garden in Oklahoma, burying some diesel and taking some measurements. And then in any event, these samples that he applied it to were shallow, and he still applied the deep curve. And if you compare those two curves, which one you choose to use makes a difference between an age of two years and 20 years. So there was Dr. Euler's testimony that Judge Murphy found undercut that theory, as well as some of Mr. Schmidt's own testimony. And the second element of your question about this timing is, the contamination on any increased property was heavy fuel oil and gas oil. It was not diesel fuel. The product released in the derailment was number two diesel fuel. That's what locomotives run on. There's no evidence in the record that anything other than the number two diesel fuel was released. So those are the two elements where it sort of breaks that connection. I'm looking for the right analogy and I'm drawing a blank, but that's an element that based on Judge Murphy's analysis of the testimony, his observation of the witnesses, his interpretation of their findings and their qualifications, led to his conclusion that what's on that property is not what was released in the derailment. I think counsel has touched on this series of consultant reports. Some of them you kind of mixed. They weren't really consultant reports. They were lab reports, and there are a couple things I wanted to touch on that. Well, I think you would agree, though, that the first report, and I don't know, I forget the name of the first company that was hired right after, shortly after the spill or accident said that some soil should be removed, contaminant soil should be removed, but it never happened. Is that a fact? It's a fact that they recommended some surface soil on the right-of-way be removed, and it is a fact based on the testimony from the NSF project manager that they did not remove that soil. Did they say why? Because it's in the middle of the busiest rail right-of-way in the country. There is no testimony, though, in the record that that surface spill, and that's what we're talking about, is a surface stained area, would be the source of migration off the property. The investigation, the concern about migration, the concern about what would potentially become of this diesel release, was the groundwater at the spot of the release and where it would go once it got to the groundwater and hit that clay strata. Now, when you say the surface, I'm going to just say, in what I can think of, I could have gone out there with a really good rake and just taken off the surface, or are we going down inches, feet, whatever? What is considered surface? Well, there wasn't any testimony specifically about that. I'm sure somebody talked about what surface layer is. You talked about the strata. Where is the surface in the strata you discussed? I mean, there wasn't testimony about that. I mean, if you're asking me, that would be like the top soil. But, yeah, it's on the right-of-way, so whether you go in there with a backhoe or a shovel,  You could take my rake. I've been yelled at by railroaders a lot for doing things I'm not supposed to do. So there was no testimony, though, connecting up that stained area, the non-removal of that stained area, with the contamination that's found on Indian Creeks property. And that's another element that Judge Murphy referenced. And he did. I won't walk through it, but he laid out the support for his conclusions on all of these major topics. And one of the items that he referenced in his conclusion that the contamination on Indian Creeks property didn't come from this derailment was the distribution of those contaminated spots on the Indian Creek property. They are spread wide. They are not all directly downgradient from the point of release. They are at different depths. There was no testimony by any of the plaintiffs' experts that would explain if fuel migrated down into the groundwater and if it then migrated south and under this 4-foot-deep wall footer, how then did it rise up and be found 2 feet deep somewhere else on the property? So as I started at the beginning, there was a lot of testimony. It's impossible to get through all of it. We've done our best to lay it out in our brief in ways that addresses plaintiff's particular arguments. Thank you. Mr. Grometer. A couple of things that you asked me that I wasn't real clear on because I didn't know. It was 4 foot below the grade excavation. The excavation was 4 foot below the grade of the building. I'm sorry about that. I didn't know that or didn't remember that. Hydraulic conductivity was fast. Both down and to the side were moved at the same speed. What we haven't heard is where's the 5,000 gallons of spilled diesel fuel? Do they have to prove that? Pardon? What burden do they carry? To prove that? To where it is? No, I think we apply it to our common sense, though, that we don't know where it is. So we're starting to get some need, I think, or concern that we've got 5,000 gallons of stuff out there. We think the evidence has clearly shown that it migrated downhill onto our property. And it showed that the rainwater traveled that way as well, correct? That's exactly right. Did you hear me? I'm sorry. I did hear you that time. I do have to get my ears checked. I'm sorry. That's my fault. I'm way back there. No, that's okay. Simply, our expert, EMR, which is Burlington Northern's FH experts, they all concurred that there was a movement. I think that the most compelling evidence to me is that you have this monitoring well 14. It's right on the property line between our property and the right-of-way. And there's a map in Joint Exhibit 15. If you have access to it, it's at page 544. It really shows you where that monitoring well is, where the building is, the building line and the fence line which marks the boundary of the properties. We know, because it was testified to by Burlington Northern's own consultants, and that's here, RETEC, and that's also in Joint Exhibit 15 at page E394. We know that in that well, on August 8th of 1995, they measured 10.4 inches of free product. On October of 1995, they measured 6.1 inches of free product. On March 15th of 1996, they measured 6.6 inches of free product. And on June 4th of 1996, they measured 34 inches, almost a yard, of free product. We know that right next to that well 14 is Soil Boring 9, which is on Indian Creek's property. And we know that Interpol, one of their laboratories, reported that samples taken from Soil Boring 9 contained total hydrocarbons as fuel oil number two, diesel. And that's E573 from the Joint Exhibit. I'm going to conclude with you, because otherwise I'm just going to start repeating myself all over again. What the trial court's order is asking, and what it did, is based on an illogical and false assumption that there were 6,000 gallons of diesel fuel that traveled 60 to 70 feet, and then on a downgrade, and then miraculously stopped at the pottery line. They're really, that's almost ridiculous. And I would ask you to take a close look at these cases, at the facts in these cases, and we're going to ask you to please reverse this wrong decision and let us go back to the trial court. We have some good arguments as to what damages should be. I don't know what they're going to be at this point. He never really ruled on those damages. He ruled on liability. He did make some mention as to remediation costs. But that's all. There was a reference to the IEPA's designation that 17,800 million parts per liter is essentially clean, or substantially clean, or something of that nature. Yeah. That's a different designation. That was the IEPA and the Burlington Garden. We weren't involved in that. And the IEPA has their own things that they're concerned about. A lot of it has to do with mobility and the water, and then, you know, this is Indian Creek, somewhere around. So they have a different set. This is really simply a trespass case. It's just exactly like if your cow jumps the fence and destroys some corn of your neighbor's. How much corn did he destroy and what did he get paid for? It might be nothing. It might be very significant. And once you show one molecule onto our property, it's a damage case. It's not a liability case. And we'd ask you to reverse it. Thank you. Thank you. All right. Thank you, counsel, for your argument here still this morning. We appreciate the depth and the professionalism. We will take the matter under advisement, and we will render a decision.